STATE OF VERMONT
WASHINGTON COUNTY, SS.

⌖ DEC 17 A 10: ⌁

SUPERIOR COURT
WASH

PAUL PLANTE and )
TAMMY COCHRAN )
)
v. )         **Washington Superior Court**
)         **Docket No. S 610-10-02 Wncv**
)
ALLAN HERRING and )
DIANA HERRING )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the court for a hearing on the merits on November 15 and 22, 2002. Plaintiffs are represented by Robin Lunge, Esq. Defendants are represented by Michael Monte, Esq. Based on the evidence admitted and after consideration of the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Plaintiff Paul Plante began living with Defendants Allan Herring and Diana Herring at their home in Moretown in November of 2000, and continued living with them through the winter, spring, and summer of 2001. In mid-August all of them reached an agreement that Mr. Plante would move out of their home and rent the mobile home located on their property. The mobile home was in poor condition, and they reached an agreement for a rental amount that reflected the fact that Mr. Plante agreed to undertake repairs at his own expense such as sealing a leak in the roof, insulating water pipes, extending a pipe for toilet waste, and adding skirting. Mr. Plante agreed to pay $300.00 per month starting in mid-August, as well as taxes attributable to the mobile home. The date on which the first payment was due, and for what rental period, was disputed at the trial. From the evidence, particularly Defendants' A and Mr. Plante's testimony, the court concludes that the first payment was due September 1st for the month starting August 15th and ending September 15th. In other words, rent was due on the first of the month and in the middle of a rental period rather than at the beginning. Mr. Plante was also to have the use of a shed on the property for the storage of belongings. The electricity bill was to remain in the name of the Herrings, who were to give Mr. Plante the bill, which he was to pay directly.

Mr. Plante moved to the mobile home in the middle of August 2001 and on October 1, 2001, Plaintiff Tammy Cochran began living with him in the mobile home. The Plaintiffs and Defendants had a friendly relationship for a period of many months. The Plaintiffs allowed the

1

Herrings to use, in the Herring home, many items of furniture and personal property of Plaintiffs that did not fit in the mobile home. At the beginning of the rental, Mr. Plante borrowed $20 and $200 from the Herrings, and the Herrings paid the $180 fee for connecting electricity in the mobile home, which was Mr. Plante's expense. Thus, from the beginning Mr. Plante owed the Herrings $400 in addition to the rent, but relations were friendly. As of the end of September, Mr. Plante owed $400, plus one month's rent of $300, plus $85.75 in auto parts for which Mr. Herring had paid, or $785.75. An account of additional rental amounts that became due as well as payments and credits is shown below. During the rental period, Mr. Plante did some of the work that he had intended but not all of it.

During the period of the rental, Mr. Plante, who is a self-employed auto repair person, did repair work on Mr. Herring's vehicles. In January of 2002 Mr. Plante repaired Mr. Herring's Jeep, and submitted an invoice for $675.00 on January 31st. In February of 2002 Mr. Plante repaired Mr. Herring's Chevy and submitted an invoice on February 28th in the amount of $450.00. In the past Mr. Herring had paid Mr. Plante for car repair work, and thus Mr. Plante expected that these invoices would be set off against his rent obligation, although the parties did not discuss this. February 1st and March 1st are the only months for which Plaintiffs did not make a rental payment by check. Although Mr. Herring did not reflect credits for the auto repair invoices on his record of charges and payments (Defendant's A), there is no evidence that he asked for missing rental payments for February 1st or March 1st, or that he paid the auto repair invoices. The court finds that both parties treated the auto repair invoices as an offset against rent and other amounts that Mr. Plante owed the Herrings from the beginning of the rental arrangement.

In July, 2002, the parties had a falling out for personal reasons. On August 8th the Defendants sent a notice to the Plaintiffs to leave the premises by September 1st, 2002 based on nonpayment of rent. Mr. Herring claimed rent due in the amount of $2,185. In fact, the court finds that the amount due as of August 8, 2002 is determined as follows:

| Date | Description | Amount | Balance |
|---|---|---|---|
| 9/31/01 | Balance due (see above) | | 785.75 |
| 10/1/01 | Rent due for 9/15-10/15 | + 300.00 | 1,085.75 |
| 10/2/01 | Payment | - 100.00 | 985.75 |
| 10/31/01 | Payment | - 200.00 | 785.75 |
| 11/1/01 | Rent due for 10/15-11/15 | + 300.00 | 1,085.75 |
| 11/5/01 | Payment | - 300.00 | 785.75 |
| 12/1/01 | Rent due for 11/15-12/15 | + 300.00 | 1,085.75 |
| 12/21/01 | Payment | - 700.00 | 385.75 |
| 1/1/02 | Rent due for 12/15-1/15 | + 300.00 | 685.75 |
| 1/31/02 | Credit (car repair invoice) | - 675.00 | 10.75 |
| 2/1/02 | Rent due for 1/15-2/15 | + 300.00 | 310.75 |
| 2/28/02 | Credit (car repair invoice) | - 450.00 | ( 139.25) |
| 3/1/02 | Rent due for 2/15-3/15 | + 300.00 | 160.75 |
| 3/13/02 | Payment | - 300.00 | ( 139.25) |

2

| | | | |
|---|---|---|---|
| 4/1/02 | Rent due for 3/15-4/15 | + 300.00 | 160.75 |
| 4/12/02 | Payment | - 300.00 | (139.25) |
| 5/1/02 | Rent due for 4/15-5/15 | + 300.00 | 160.75 |
| 5/20/02 | Payment | - 300.00 | ( 139.25) |
| 6/1/02 | Rent due for 5/15-6/15 | + 300.00 | 160.75 |
| 7/1/02 | Rent due for 6/15-7/15 | + 300.00 | 460.75 |
| 7/17/02 | Payment | - 300.00 | 160.75 |
| 8/1/02 | Rent due for 7/15-8/15 | + 300.00 | 460.75 |

Thus, there was an unpaid amount of rent of $460.75 as of August 8, 2002. Mr. Herring's accounting was wrong as he had not given credit for the auto repair invoices, or for the payment made on May 20, 2002. Because there was an amount of rent unpaid, the notice Mr. Herring gave was effective to terminate the tenancy as of September 1, 2002. The court agrees with the Defendants' position that the payments Plaintiffs made were credited first to any sums due (i.e., the original loans), so that the balance due was for unpaid rent and not personal loans.

On August 21st (after they had received the termination letter and after the August 1st rent payment was overdue), the Plaintiffs told the Defendants that they would not pay any more rent due to the poor condition of the premises. The Plaintiffs then prepared and sent to Defendants a certified letter in which they claimed they were withholding rent. The Defendants refused to accept the certified letter and therefore never received notice of the withholding of rent, nor did they receive actual notice of the reasons.

The Plaintiffs remained on the premises and have not paid any further rent. In early September the Defendants took personal property that they were storing in their home for the Plaintiffs outside and put it in a pile outside, covered by a plastic tarp. They did not say anything to the Plaintiffs about this but the Plaintiffs saw it. It rained, and the Plaintiffs removed a computer from the pile but did not take possession of the remainder of the personal property, which disappeared. Most of it was taken by the Defendants back into their home.

In September Mr. Herring removed a number of the Plaintiffs' personal possessions from a storage shed on the property and mowed down the storage shed. Plaintiffs had to rent a storage shed for their possessions. They paid $261.67 for a 4-month rental for storage beginning on September 11th. At some time when the Plaintiffs were not physically present at the mobile home, Mr. Herring removed a deck that was attached to the mobile home and had been used by the Plaintiffs as part of the living area related to the mobile home.

On September 18th the Plaintiffs went to New Hampshire for the day. They returned at 11:00 p.m. and discovered that there was no electricity in their home and that the breaker had been removed. The next day, on September 19th, they had the breaker repaired, restoring electricity. They then discovered that there was no water. Water was provided to the premises from a spring uphill on the Defendants' property, and the Plaintiffs discovered that the water supply had been altered and there was no water running to the mobile home. The Plaintiffs

3

obtained parts and fixed the water supply, restoring water to the mobile home. There was no communication between the parties. Mr. Plante incurred expenses of $21.58 + $8.78 + $64.40 fixing the water supply, for a total of $94.76.

Mr. Herring then got out his excavator and dug a ditch in the vicinity of the water line that runs between the spring and the mobile home. He also used the excavator to cover with dirt a spigot that had been used by the Plaintiffs to obtain water to repair their water supply. Thereafter there was no water supply to the mobile home. Mr. Plante claims that Mr. Herring cut off the water supply, and Mr. Herring claims that Mr. Plante did so himself. From the credible evidence the court finds that Mr. Herring cut off the water supply, knowing that there would be no water supplied to the mobile home, both the first time and the second time.

The Plaintiffs contacted the town health officer, who sent a letter on September 20th to Mr. Herring directing him to restore the water supply and provide bottled water in the interim. Mr. Herring claims that he telephoned the health officer and did not understand that he was under any obligation to do anything to restore the water. The court finds this testimony not credible. The court finds that Mr. Herring had clear notice from the health officer's letter that he was required to restore the water supply to the mobile home rented by Plaintiffs.

The water supply was not restored. The Plaintiffs were unable to take showers, do laundry, cook, or maintain daily living in the mobile home without water. In addition, Mr. Plante raises turkeys, and needed water to water the turkeys. They began staying in motels and eating out, returning to the mobile home to check mail, change clothes, care for the turkeys, and maintain possession.

On October 2nd, the Plaintiffs caused the property to be inspected by a fire inspector from the Department of Labor & Industry. The inspector subsequently sent a letter to the Defendants notifying them of violations related to electrical receptacles and requiring compliance by November 5th. On October 8th the Plaintiffs obtained a temporary restraining order from the court, which was served on the Defendants on October 11th, restraining them from interfering with the water supply. On October 12th the Defendants caused the locks on the mobile home to be changed while the Plaintiffs were not present.

A preliminary hearing was held in court on October 17th. On October 20th the Defendants restored water to the mobile home, although the flow of water is substantially reduced from the flow before September 18th and is not sufficient for normal use. The Plaintiffs returned to living in the mobile home. There was no water supply for one month, from September 20 to October 20, 2002. The Plaintiffs total cost of obtaining lodging elsewhere was $1,405.00. As of early November, the electrical problems identified by the housing inspector were fixed.

At some point during the rental the electric company shut off the electricity after payment was delayed when the Defendants did not give the bill to the Plaintiffs. The Plaintiffs were required to pay a $20 late fee and a $20 reinstatement fee.

4

At the time of hearing, all parties agreed that Plaintiffs' right to possession would terminate on December 15, 2002. Plaintiffs agreed to vacate as of that date, and that a writ of possession could issue from the court if they did not vacate as of that date, based on their oral stipulation and with no further notice or hearing on the subject.

Disregarding any claims for reduction in rental, damages, or other amounts due, the accounting updated through December 15th is as follows:

| 8/1/02 | Balance due (see above) | | | 460.75 |
|---|---|---|---|---|
| 9/1/02 | Rent due for 8/15-9/15 | + | 300.00 | 760.75 |
| 10/1/02 | Rent due for 9/15-10/15 | + | 300.00 | 1,060.75 |
| 11/1/02 | Rent due for 10/15-11/15 | + | 300.00 | 1,360.75 |
| 12/1/02 | Rent due for 11/15-12/15 | + | 300.00 | 1,660.75 |

## Conclusions of Law

Plaintiffs claim that Defendants' actions constituted an illegal eviction, and claim damages and attorneys fees. They also claim an interference with their use and enjoyment of the property warranting damages. They further claim reductions in rent based on breach of the warranty of habitability, and damages for breach of the rental agreement.

In addition to possession as of December 15th, to which the parties have stipulated, Defendants claim unpaid rent and damages to the premises.

### Plaintiffs' claim for illegal eviction.

Plaintiffs claim that the Defendants' conduct amounted to an illegal eviction entitling them to damages and recovery of attorney's fees. The evidence shows that the Defendants attempted to evict the Plaintiffs without legal process, contrary to the requirements of law. The process started with a valid notice from the Defendants to Plaintiffs on August 8th terminating the tenancy. However, when the Plaintiffs failed to move out by September 1st, rather than pursue an eviction with legal process, the Defendants attempted to evict the Plaintiffs by first putting their personal possessions outside under a plastic tarp, then turning off their electricity and water, then turning off the water supply a second time after Mr. Plante repaired it when it was first shut off, removing the deck and mowing down the shed, and finally changing the locks while the Plaintiffs remained in possession of the premises. At no time did the Defendants file an eviction action with the court until they filed their counterclaim in this action on October 30, 2002. Plaintiffs have established their claim for an illegal eviction and are entitled to damages and attorney's fees.

5

Damages include the following:

| | |
|---|---|
| Lodging | $1,405.00 |
| Repair of the water supply | 94.76 |
| 3 months storage rental (9/11-12/15) | 196.25 |
| Total | $1,696.01 |

Food expenses for restaurant meals have not been proved, as Plaintiffs have not shown the extent to which these costs exceeded alternative expenses for food if they had eaten at home.

### Plaintiffs' claim for breach of the warranty of habitability.

Plaintiffs have not proved that notice of any breach of warranty of habitability was given to Defendants at any time prior to September 20th. Therefore, they are not entitled to any damages on this claim for any period prior to September 20th.

Plaintiffs have proved that the mobile home was unusable for one month starting on September 20th, when notice was given to Defendants that there was no water supply to the mobile home. Plaintiffs are therefore entitled to a credit of $300.00 for one month's rent. Plaintiffs have proved that the flow of water for two months from mid-October until December 15th was insufficient to meet reasonable standards of habitability, and are thus entitled to a credit against rent for $50.00 per month for a total of $100.00. Plaintiffs have also proved that there were minor violations of the warranty of habitability as found by the inspector, and these were unrepaired for one month after notice from the inspector. Plaintiffs are therefore entitled to a credit against rent for $20.00 attributable to the electrical violations. The total amount of credit against rent Plaintiffs are entitled to is $420.00.

### Plaintiffs' claim for interference with use and enjoyment.

Plaintiffs have already been awarded damages and credits for the loss of use of the mobile home for one month, and for reduced value of the home for the period after October 20th. Plaintiffs are also entitled to damages of $250.00 for interference with use and enjoyment during the period of September 1st to September 20th, during which time Defendants interfered with the Plaintiffs use and enjoyment of the property by harassing them by mowing down the shed, putting their possessions outside under a tarp, and interfering with their electricity and water supply.

### Plaintiffs' claim for breach of the rental agreement.

Plaintiffs have proved damages of $40.00 in unnecessary late payment and reinstatement fees the Plaintiffs were required to pay for electrical service, due to Defendant's late delivery of the rental bill to them.

### Defendants' claims.

Defendants have shown that the Plaintiffs have a remaining rent obligation in the amount of $1,660.75 (against which rent credits identified above will be applied). Defendants have not proved their claim that Plaintiffs caused damage to the premises.

6

**Summary.**

Defendants owe Plaintiffs:

| | | |
|---|---|---|
| Damages for illegal eviction | 1,696.01 | |
| Habitability damages | 420.00 | |
| Interference damages | 250.00 | |
| Damages for breach | 40.00 | |
| Total | 2,406.01 | 2,406.01 |

Plaintiffs owe Defendants:

| | | |
|---|---|---|
| Unpaid rent | 1,660.75 | - 1,660.75 |
| **Net due to Plaintiffs from Defendants** | | **745.26** |

In addition, Plaintiffs are entitled to reasonable attorneys' fees.

## Order

Plaintiff's attorney shall submit an affidavit of attorneys' fees, and a proposed Judgment Order. Defendant's attorney shall have five business days to file a response to the amount of attorneys' fees and the terms of the proposed objection.

Dated at Montpelier this 10th of December, 2002.

Mary Miles Teachout
Superior Judge

7